# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Terri Jackson,

                    Plaintiff,

                                              Civ. No. 04-4686 (RHK/JSM)
                                              **MEMORANDUM OPINION**
                                              **AND ORDER**

v.

NEXT Financial Group, Inc. and
Minnesota Health & Financial
Services Company,

                    Defendants.

---

Steven Andrew Smith, Nichols Kaster & Anderson, PLLP, Minneapolis, Minnesota, for
Plaintiff.

Daniel P. Lennington, Warner Norcross & Judd, Grand Rapids, Michigan, and Trevor R.
Walsten, Walsten & Te Slaa, Bloomington, Minnesota, for Defendant NEXT Financial
Group, Inc.

Christopher J. Harristhal, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis,
Minnesota, for Defendant Minnesota Health & Financial Services Company.

---

## Introduction

        Plaintiff Terri Jackson claims that her former employer, Defendant Minnesota

Health & Financial Services Company ("MHFS"), discriminated against her because she

was pregnant and in doing so, violated Title VII and the Minnesota Human Rights Act.

She makes identical claims against Defendant NEXT Financial Group, Inc. ("NEXT"), a

corporation with close business ties to MHFS.  In order to bring an action under Title VII,

a defendant employer must employ fifteen or more employees—MHFS employed five

during the relevant time.   In an effort to avoid this jurisdictional impasse, Jackson seeks

to consolidate MHFS and NEXT to meet Title VII's numerosity requirement.   The Court

finds that the two corporations cannot be consolidated for purposes of Title VII and,

because Jackson concedes that MHFS does not satisfy the statute's numerosity

requirement, her Title VII claims fail.   Having determined not to exercise supplemental

jurisdiction over the remaining state law claims, the Court will dismiss this action.

## Background

### A.      Jackson Hired by Thoele

In September 2003, Jackson was hired to work as the marketing director for MHFS

by Jeff Thoele, the owner of the company.   MHFS is a Minnesota-based investment

services company, which provides investment products and asset management services to

clients.   At the time she was hired by Thoele, MHFS was affiliated with NetWorth, Inc.

("NetWorth").   As mentioned above, the company had five employees when Jackson

worked there, and it currently has three employees.   (Thoele Dep. Tr. at 12-13.)

Much of Jackson's job involved marketing to MHFS's clients.   Specifically, she

coordinated and planned marketing events.   In large part, this consisted of making

invitations, obtaining the site for the event, arranging the entertainment, organizing the

event presentation, and handling "most of the event details."   (Jackson Dep. Tr. at 59-61.)

She also designed marketing brochures which were sent to clients.   Additionally, Jackson

had  responsibilities as a "client liaison" in that she was responsible for the company's "Love Affair Marketing," which involved sending out "well-wishes, birthday cards, flowers to clients in hospitals," and other "concierge type" services.  (Id.)  Thoele was Jackson's supervisor during her employment at MHFS.  (See, e.g., id. at 47; 96-97; 201-202; 226; 259-65.)

## B.    Thoele's Agreement with NEXT

In December 2003, MHFS's relationship with NetWorth was terminated.  Shortly thereafter, Thoele entered into a business relationship with NEXT, an independent broker/dealer headquartered in Houston, Texas.  On January 5, 2004, Thoele executed an "Independent Contractor's Agreement" with NEXT in order to become one of NEXT's independent "registered representatives."[1]  (Brooks Aff. Ex. 1.)

---

[1]Jackson was on vacation when Thoele made the decision to enter into a business relationship with NEXT.  She described the change as follows:

> I had been gone for two weeks . . . on a vacation and came back, and the relationship between Jeff Thoele and NEXT Financial was already in the works.  So, my understanding was that the name of the business that he was — the name of his business from that point on was NEXT Financial.  That was the business relationship that he would be utilizing.

(Jackson Dep. Tr. at 46.)  She also testified, in explaining why she stated on her resume that she worked for NEXT beginning in September 2003 (at which point Thoele was in fact still working with NetWorth and had not entered into a contract with NEXT), that "no potential employer would care . . . for [her] to list through the series of name changes that [her employer] went through during that year," and that she "wasn't going to include the additional names that [she] was employed under."  (Id. at 183.)  Finally, in explaining a similar designation in her interrogatory responses, Jackson stated that "it didn't occur to [her] to have to go through the semantics on [her] resume of adding three name changes for one company, specifically one place that [she] worked at."  (Id. at 186.)

3

NEXT is affiliated with over 600 independent registered representatives throughout the country.  Generally, these registered representatives are able to sell securities, mutual funds, variable annuities, and other financial products through NEXT.  (Id. ¶ 4.)  NEXT provides support and supervision regarding compliance with federal and state securities laws and regulations to its registered representatives.  (Id. ¶ 4.)  Thus, much of NEXT's affiliation with its registered representatives involves supervision and compliance support, as well as training and continuing education programs regarding securities laws and regulations.  (Id. at ¶ 8.)  In this regard, the Independent Contractor's Agreement provides that Thoele

> shall comply with all rules and regulations promulgated by the Regulatory Authorities.  Although [Thoele] is an independent contractor free to conduct [his] mode of operation as set forth in this agreement, NEXT is obligated by the Regulatory Authorities to supervise [Thoele's] securities activities.  In conjunction therewith, NEXT shall have the right to require [Thoele] to abide by NEXT's written policies and procedures. . . .

(Id., Ex. 1.)  NEXT does not, however, provide training or continuing education to the employees of its registered representatives (id. ¶ 14), and Jackson never received any training from NEXT (Jackson Dep. Tr. at 73).

The Independent Contractor's Agreement also provides that nothing in the agreement "shall be construed to create the relationship of employer/employee, joint venture, franchiser and franchisee or partnership between NEXT and" Thoele.  (Brooks Aff. Ex. 1.)  The agreement does not address the structure or make-up of Thoele's business or support staff, except to state that Thoele

> shall be solely responsible for [his] expenses incurred in connection with [his] performance under this agreement including, without limitation, expenses or costs associated with . . . administrative and secretarial assistance, . . . [and] rental of real property or equipment.

(Id.)

NEXT has a role in the financial transactions originating with its registered representatives as well.  There are two basic types of transactions carried out by registered representatives.  In the first type, a customer places an order with the registered representative.  The representative then sends the order to NEXT, which reviews the order for compliance with security laws, sends the order to a clearing firm (which exchanges the money for the stock certificate), and then receives a commission.  NEXT keeps a portion of the commission and sends the remaining amount to the registered representative.  The second type of transaction is best described as a direct sale.  In direct sales, the registered representative sells mutual funds or annuity products to clients directly through the mutual fund or annuity company.  However, commissions still go through NEXT, and NEXT still supervises the transaction to ensure compliance with securities laws.  (Id. ¶¶ 6-7.)  In addition to its involvement in the registered representative's financial transactions, NEXT also provides some coordinated marketing programs that representatives may voluntarily use.

As part of Thoele's affiliation with NEXT, MHFS implemented some changes in its marketing and office supplies.  In February 2004, MHFS announced to its clients that it was now "a NEXT Financial Group, Inc. branch office."  (Smith Aff. Ex. C.)  Pursuant

to this change, MHFS changed the signage outside of its office, its employee business cards and email addresses, the company website, the office supplies, and the telephone greeting to "NEXT Financial." (Jackson Dep. Tr. At 261-67.)

## C.      Jackson's Work Duties in 2004

After the relationship with NEXT was established, one of Jackson's responsibilities was to change all of MHFS's marketing materials to indicate that the company was now doing business as NEXT. (Id. At 92.) Some of those marketing materials identified Thoele as "Jeff Thoele of NEXT Financial" and identified the company generally as "Jeff Thoele, Trevor Lastoka [an employee of MHFS] and the staff of NEXT Financial Group, Inc." (Smith Aff. Ex. E.) Jackson worked with employees and officers of NEXT in developing those marketing materials from a compliance perspective. Specifically, she testified that she "worked with Karen Eyster [NEXT's Chief Compliance Officer] on every piece of printed material that left our office, every piece of printed material that went to clients." (Jackson Dep. Tr. at 240.) She also worked on a series of client recruitment events called "Meet Your Money Minder" luncheons in an effort to maintain Thoele's client base despite the change from NetWorth to NEXT. (Id. at 60.)

In June 2004, Jackson worked with numerous individuals at NEXT on a "representative reception." (Id. at 64-65.) The representative reception was an event designed as a "meet and greet type of reception to meet prospective financial

representatives throughout the state." (Id. at 65.)  Her work on the representative

reception involved collaboration with other individuals at NEXT in addition to Eyster.

(Id. at 240-47.)  She worked "very closely" with Julie Nguyen, NEXT's marketing

associate, on planning the event.  (Id. at 240-41.)  She also testified that she "worked with

Jeff Auld, who was the CEO of NEXT Financial, pretty closely to determine his role in"

the representative reception, as he "thought he was going to present a short speech."  (Id.

at 243.)  She also obtained Auld's schedule from his assistant in order to schedule the

representative reception on a date that he was available to attend.  (Id. at 247.)

**D.    Jackson's Resignation and Litigation**

On May 27, 2004, Jackson informed Thoele that she was almost four months

pregnant.  At that time, she was working three days a week for the company.  On August

16, 2004, Thoele informed Jackson that he needed to reduce her hours by two-thirds,

down to a one-day-a-week schedule.  Thoele explained that his decision was based on

business needs, and was not at all due to her job performance.  Thoele said that if Jackson

elected not to work the reduced schedule, she would have to leave MHFS, and would be

compensated through the end of the current pay period.  On August 19, 2004, after

determining that she could not afford to take the reduction in hours, Jackson resigned

from MHFS.  This action followed.  Count I of Jackson's Complaint alleges pregnancy

discrimination in violation of Title VII, 42 U.S.C. § 2000e-2.  Count II alleges pregnancy

discrimination in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §

363A.08, subd. 2(c).  Now before the Court are the parties' cross-motions for summary
judgment.

## Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the
nonmoving party, there is no genuine issue as to any material fact and the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett,
477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50
(1986).  The moving party bears the burden of showing that the material facts in the case
are undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire &
Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and
the inferences that may be reasonably drawn from it, in the light most favorable to the
nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723
(8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).
The nonmoving party may not rest on mere allegations or denials, but must show through
the presentation of admissible evidence that specific facts exist creating a genuine issue
for trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957
(8th Cir. 1995).

## Analysis

Jackson claims that she was discriminated against because of her pregnancy in
violation of Title VII and the MHRA.  Title VII, however, only applies to employers with

"fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." [2]  42 U.S.C. § 2000e(b).  As will be discussed in detail below, the Court determines that MHFS was Jackson's sole employer, and there is no dispute that MHFS employed no more than five people during the relevant time (Mem. in Opp'n at 14).  Thus, the Court determines that Jackson's Title VII claims fail.  See, e.g., Graves v. Women's Prof. Rodeo Ass'n, Inc., 907 F.2d 71, 74 (8th Cir. 1990).  Furthermore, the Court declines to exercise supplemental jurisdiction over Jackson's MHRA claims, and those claims will be dismissed without prejudice.

## A.     Title VII

Jackson seeks to overcome the problem posed by MHFS's lack of the requisite fifteen employees by arguing that MHFS and NEXT should be "consolidated" to meet Title VII's employee numerosity element.[3]  "Title VII . . . is to be accorded a liberal construction in order to carry out the purposes of Congress . . . [and] [s]uch liberal construction is also to be given to the definition of 'employer'."  Baker v. Stuart Broadcasting Co., 560 F.2d 389, 391 (8th Cir. 1977) (internal quotations and citations omitted).  "Separate entities may be consolidated for purposes of meeting [Title VII's] employee numerosity requirement in certain circumstances."  Artis v. Francis Howell

[2] "Current calendar year," means the calendar year in which the alleged discrimination occurred.  See, e.g., Komorowski v. Townline Mini-Mart and Rest., 162 F.3d 962, 965 (7th Cir. 1998).  The MHRA does not have the same numerosity requirement.  See Minn. Stat. § 363A.03, subd. 16.

[3] There is no dispute that the two companies, if consolidated, would satisfy Title VII's numerosity requirement.

North Band Booster Association, Inc., 161 F.3d 1178, 1184 (8th Cir. 1998).  A court's

decision whether to consolidate separate entities for purposes of Title VII depends on "the

following factors: '(1) interrelation of operations, (2) common management, (3)

centralized control of labor relations, and (4) common ownership or financial control.'"

Id. (quoting Baker, 560 F.2d at 392).  "[A]ll factors are to be considered, with no one

factor controlling."  Id. (citation omitted).  The Court will consider each of the factors in

turn.

**1.      Interrelation of operations**

First, in assessing the interrelation of operations, "the key is the degree to which

[NEXT] or its employees were in fact involved in the actual functioning of [MHFS]."

Webb v. American Red Cross, 652 F. Supp. 917, 919 (D. Neb. 1986) (internal quotation

omitted).  The court in Webb determined that two companies did not have interrelated

operations, in part because the by-laws and personnel policies and procedures of the two

companies were distinct.  Id. at 920.  Circumstances such as the sharing of employees and

equipment between two companies and the transfer of employees from one company to

the other, have also been found to support consolidation of companies under this factor.

EEOC v. Financial Assurance, Inc., 624 F. Supp. 686, 690 (W.D. Mo. 1985).  And in

Jarred v. Walters Indus. Electronics, Inc., 153 F. Supp. 2d 1095, 1099 (W.D. Mo. 2001),

the court noted that "aesthetic facts . . . [such as] the sharing of office space, switchboard,

and utilities goes toward the finding of an internal working relationship."  Thus, both the

internal and the external manifestations of the interrelations between companies may be relevant in the analysis of this factor.

Jackson focuses much of her argument on this factor.  (See Mem. in Opp'n at 14-17.)  She contends that MHFS "went to great lengths to hold itself out as NEXT," and points to (1) the signage outside the MHFS office which reads "NEXT Financial"; (2) business cards, email addresses, the company website, telephone greeting, and office supplies, which were all labeled "NEXT Financial"; and (3) various marketing materials sent on behalf of "Jeff Thoele of NEXT Financial."  (Id. at 14-15.)  Jackson also highlights NEXT's exercise of control over MHFS's marketing and securities compliance, its requirements that MHFS abide by certain written policies and procedures, her frequent communication with certain NEXT employees, and her work with NEXT on marketing and solicitation materials.  (Id. at 15-16.)  According to Jackson, these factors establish that the operations of MHFS and NEXT were interrelated.  (Mem. in Opp'n at 15.)

There is no dispute that "NEXT provides supervision and compliance support, as well as training and continuing education programs with respect to securities laws and regulations" to its registered representatives.  (Brooks Aff. ¶ 8)  Nor is there any question that Thoele, and by extension MHFS, presented themselves to the public as NEXT. While these circumstances amount to a thin showing on this factor[4], the Court finds that

_____

[4]Even under the cases Jackson cites in support of her showing on this factor, the facts of the instant case are distinguishable.  For example, in Jarred, the court noted that the

there was some interrelation of operations between the two companies based on the

outward manifestations of Thoele and MHFS, and on NEXT's involvement in the

company's marketing and securities compliance.

### 2.    Common Management

Second, in assessing the common management factor, "the existence of

interlocking officers and directors is particularly relevant."  Webb, 652 F. Supp. at 920;

Scheidecker v. Arvig Enterprises, Inc., 122 F. Supp. 2d 1031, 1038 (D. Minn. 2000) (in

determining that two companies satisfied the common management factor, noting that the

boards of directors of the two companies "were nearly mirror-images of one another").  In

this case, the Court can find no indication of common management between NEXT and

MHFS.  There is no allegation that the boards of directors or officers of the two

companies overlapped at all.  Nor is there a serious contention that the "channels of

management authority" were the same at NEXT and MHFS.  Scheidecker, 122 F. Supp.

2d at 1038.

Jackson contends that her work with employees of NEXT on planning certain

marketing events amounted to taking "frequent direction" from NEXT.  (Mem. in Opp'n

at 17.)  She stated that she worked with NEXT's Chief Compliance Officer "on every

piece of printed material that left [MHFS's] office, every piece of printed material that

---

companies shared building space, a time-clock area for employees, phone and fax
numbers, and mailing and shipping services. 153 F. Supp. 2d at 1099.  The companies
also shared secretarial services.  Id.; see also Financial Assurance, 624 F. Supp. at 689-90
(similar facts).  Such facts are not present here.

went to clients." (Jackson Dep. Tr. at 240.) Jackson also points to the influence certain NEXT individuals had on the wording of marketing materials that she sent to Thoele's clients.

Jackson does not, however, present evidence to suggest that her work with NEXT individuals, even on marketing materials, had to do with anything other than compliance with securities laws and regulations—an area of a registered representative's business specifically identified by NEXT as being subject to oversight. And NEXT's involvement in compliance has not been shown to bleed into other aspects of MHFS's functioning as a company. Accordingly, the Court determines that Jackson's interaction with NEXT involving securities compliance, even as it applied to her marketing duties, does not amount to common management. See, e.g., Evans v. McDonald's Corp., 936 F.2d 1087, 1090 (10th Cir. 1991) (considering these factors and noting franchisor was not the plaintiff's employer despite fact that franchisor "stringently controlled the manner of its franchisee's operations, conducted frequent inspections, and provided training for franchise employees").

Furthermore, to the extent that Jackson worked with NEXT employees outside of the area of securities compliance, that work centered around the representative reception held in June 2004. (Jackson Dep. Tr. at 240-47.) Jackson's testimony regarding the representative reception reveals that, even though some of her decisions regarding the event were subject to approval by numerous people, some of whom were NEXT

employees or officers, her work with NEXT was mainly collaborative in nature.  (See, e.g., id. 244-45.)  Significantly, the record does not suggest that she answered to any NEXT employee as she did to Thoele, her supervisor and the owner of MHFS.  Thus, the Court determines that Jackson's work with individuals at NEXT on the representative reception—a single event—does not equate with common management between the two companies.

Finally, there is no evidence that NEXT had anything to do with the inner workings of MHFS, that NEXT had any control over how MHFS managed or organized its office, who MHFS hired or fired, where MHFS located its office, or MHFS's hours of operation.  (See Brooks Aff. ¶ 11.)  For these reasons, the Court determines that MHFS and NEXT were not subject to common management, and this factor weighs against a finding that the two companies were joint employers under Title VII.

### 3.    Centralized Control of Labor Relations

The third factor, "centralized control of labor relations," is often considered to carry the most weight in this analysis.  Backus v. Mena Newspapers, Inc., 224 F. Supp. 2d 1228, 1232-33 (W.D. Ark. 2002) (noting that in considering the Baker factors, "courts . . . have held that the critical question to be answered is: What entity made the final decision regarding employment matters related to the person claiming discrimination?" (internal quotation omitted)).  The existence of centralized control of labor relations is especially relevant in a case such as the instant one, where there is no strong evidence of

common ownership or management between MHFS and NEXT. Under this analysis,
"[t]he requisite 'control' is not potential control, but rather actual and active control of the
day-to-day labor practices." Webb, 652 F. Supp. at 921.

In Artis, the Eighth Circuit determined that two companies could not be
consolidated for purposes of Title VII. 161 F.3d at 1184. In this regard, the court noted
that the companies operated separate payroll systems and that only one of the companies
paid and fired the plaintiff. Id. Similarly, in holding that this factor did not weigh in
favor of finding that two companies could be consolidated for purposes of Title VII, other
courts have looked to one company's lack of control over "the hiring, firing, wages,
hours, working conditions, or fringe benefits" of the other company's employees, Webb,
652 F. Supp. at 921; one company's lack of control over "the day-to-day operations" of
another company, such as "the work hours, work schedules, or daily activities" of the
other company's employees, Nixon v. Northwestern Mut. Life Ins. Co., 58 F. Supp. 2d
1269, 1275 (D. Kan. 1999); and a general lack of control by a franchisor "over [the
franchisee's] labor relations with his franchise employees," Evans, 936 F.2d at 1090. Cf.
Scheidecker, 122 F. Supp. 2d at 1039 (in determining that fact issue regarding
appropriateness of consolidation existed, noting that the two companies shared one
human resources department and the same person made the "ultimate decision" to
terminate the employees at both companies).

Here, the evidence indicates that Thoele had sole decision making authority and

control over the employees of MHFS, including Jackson.  In fact, Jackson does not allege

that anyone <u>but</u> Thoele made the decision to cut her hours.[5]  Nor is there any evidence

that NEXT could have exercised any control over Thoele's employee-related decisions at

MHFS.  Furthermore, there was no formal centralization of employee-related functions

between the two companies: Jackson was paid by MHFS (MHFS was the payor listed on

her paychecks), Thoele determined her vacation and hours, Thoele set her compensation,

Thoele was her "daily supervisor," Thoele gave her feedback and evaluations regarding

her performance at work, and Thoele was the only person she would see about getting a

raise (or, theoretically, being subject to discipline).  (<u>See, e.g.</u>, Jackson Dep. Tr. at 264-

68.)  These facts indicate that there was no centralized control between NEXT and MHFS

over Jackson's employment or over MHFS employees more generally.

Jackson's main argument regarding this factor is that NEXT "made its presence

felt in the labor operations of MHFS" in that an administrative assistant agreement

---

[5] That Thoele was the sole decision maker regarding Jackson's cut in hours is central to
her argument that she presented direct evidence of pregnancy discrimination.  (<u>See, e.g.</u>,
Mem. in Opp'n at 28 (citing a statement made by Thoele as "nothing short of an
admission of the direct link between <u>Mr. Thoele's</u> discriminatory intent and <u>his decision</u>
to drastically reduce Ms. Jackson's hours and salary" (emphasis added)).)  Jackson did,
however, testify that she did not know whether Thoele received input from others
regarding her performance evaluations or his ultimate decision to reduce her hours.
(Jackson Dep. Tr. at 286-89.)  Thoele testified that he received input from two MHFS
employees, Trevor Lastoka and Sandy Thoele (Thoele's wife), regarding his decision
to reduce Jackson's hours.  (Thoele Dep. Tr. at 41-42.)  He ultimately rejected this advice
(which was to fire Jackson outright, rather than reduce her hours).  (<u>Id.</u>)  Jackson has
presented no evidence to suggest that Thoele ever consulted with anyone <u>from NEXT</u>
regarding his decisions as to her performance evaluations or employment.

Jackson signed during her employment at MHFS (the "Agreement") listed NEXT on it. (Mem. in Opp'n at 17-18.)  That agreement states that it "is made by and between Minnesota Health and Financial Services, d/b/a NEXT Financial Group, with its principal offices at 6301 Wayzata Blvd. . . . (the 'Employer'), and the undersigned employee, an individual ('the Employee')." (Smith Aff. Ex. F (emphasis added).)  The agreement is signed by Thoele and Jackson.  (Id.)

As support for her contention that the Agreement establishes centralized control of labor relations, Jackson cites Scheidecker, where the court noted that the companies' "employment-related documents list the company names interchangeably," 122 F. Supp. 2d at 1039, in determining that this factor weighed in favor of consolidating the companies.[6]  Here, however, the Agreement does precisely the opposite—it lists both company names rather than using the company names interchangeably.  Furthermore, Jackson does not suggest that there was any practical effect to the Agreement's wording; there is no evidence to suggest that the Agreement transferred any actual control or decision making authority to NEXT (as opposed to Thoele).  Nor does she dispute that NEXT did not pay any wages or provide any benefits to her, did not withhold Social Security or other taxes for her, did not set her working hours, vacation days, or sick days, did not define her duties, and did not set the terms and conditions of her employment.

---

[6]The Court notes that the decision in Scheidecker regarding this factor was also based on the companies' "shared human resources department," and the fact that one person "made the 'ultimate decision'" to terminate employees at both companies.  122 F. Supp. 2d at 1039.  Those circumstances are not present in the instant case.

(Brooks Aff. ¶ 22.)  There are simply no facts to indicate that NEXT had any actual

control over Jackson's employment with MHFS.[7]

In her deposition, Jackson stated that, when Thoele made decisions regarding her

employment (such as those regarding compensation, vacation, or evaluations) she

believed that "Jeff Thoele was NEXT Financial Group."  (Jackson Dep. Tr. at 265.)  For

example, she testified that she discussed vacation time or time-off issues with "Jeff

Thoele acting as NEXT Financial."  (Id.)  These conclusions on Jackson's part, in

themselves, do not have any impact on the Court's reasoning or ultimate conclusion, as

she does not present the Court with any evidence from which it could conclude that

Thoele was acting "as NEXT Financial" with respect to his employment decisions related

---

[7] Plaintiff states that "NEXT required MHFS to abide by its written policies and
procedures and maintained control over administrative assistants and other support staff."
(Mem. in Opp'n at 15.)  As support for this statement she cites the entire Independent
Contractor's Agreement and two pages of Thoele's deposition testimony where a
confused line of questioning ensued regarding one provision of that agreement.  The
agreement provides, under the heading "Regulatory Compliance and Supervision", that
"Representatives may not hamper interview [sic.] with administrative assistants or other
support staff as requested by the Compliance Department or OSI Supervisor."  (Brooks
Aff. Ex. 1 at 3.)  Thoele's deposition testimony regarding this provision sheds no light on
its meaning, and the plain language of the provision does not suggest to the Court that
NEXT "maintained control over administrative assistants and other support staff" as
Jackson states in her Memorandum.  (Mem. in Opp'n at 15.)  Furthermore, the Court
notes, as it did above, that the "requisite 'control' is not potential control, but rather actual
and active control of the day-to-day labor practices."  Webb, 652 F. Supp. at 921.  Thus,
even if the plain language of this provision of the Independent Contractor's Agreement
conferred some control over the administrative and support staff of MHFS (which the
Court expresses skepticism about), the lack of any evidence that NEXT actually exercised
control over employment matters is significant.

to Jackson.[8]  See Nixon, 58 F. Supp. 2d at 1275 (holding that two companies were not a

single employer under same factors as considered in Baker despite the plaintiff's

testimony that "she believed defendant controlled [her employer's] business, including

employment decisions" where the plaintiff failed to produce evidence of such control).

Finally, Jackson's arguments are belied by her testimony suggesting that, for all

practical purposes, she had a single employer throughout her employment with MHFS.

For example, in explaining why, on her resume, she listed NEXT as her employer for the

entire year she worked for MHFS, rather than specifying that the relationship with NEXT

began months after she started working for MHFS, she stated that "it didn't occur to [her]

to have to go through the semantics on [her] resume of adding three name changes for one

company, specifically one place that [she] worked at."  (Jackson Dep. Tr. at 186; see also

supra n.1.)  While this testimony is not dispositive of the issue, it does support a

determination that, despite Thoele's various business relationships (with NetWorth and

then NEXT), Jackson was ultimately employed by MHFS.  Accordingly, having

_____

[8]When asked why she believed that Thoele was acting as NEXT, Jackson testified that her
belief was based on the fact that the company represented itself as NEXT and that both
companies' names were listed on her employment agreement.  (Jackson Dep. Tr. at 261-
62 ("Company name was NEXT Financial. E-mail addresses were NEXT Financial. All
marketing materials, all correspondence that was sent out of the office labeled NEXT
Financial.  Our Website, the way we answered the phone.").)  The Court does not view
these types of outward manifestations, without the exercise of actual control over
Jackson's employment, as sufficient to establish that MHFS and NEXT exercised
centralized control over labor relations.  See, e.g., Nixon, 58 F. Supp. 2d at 1275 (noting
that to satisfy this factor, one company "must control the day-to-day employment
decisions of [the other]").

considered all of the above circumstances, this factor weighs against a finding that MHFS

and NEXT were joint employers for purposes of Title VII.

### 4.      Common Ownership or Financial Control

There is no real dispute regarding the lack of common ownership or financial

control between the two companies.  The entirety of Jackson's argument regarding this

factor is that Thoele "is a 'shareholder' of NEXT."  (Mem. in Opp'n at 18.)  There is no

evidence regarding the extent of Thoele's ownership of NEXT shares, but considering

that NEXT works with over 600 independent registered representatives like Thoele, the

Court is not persuaded that Thoele's ownership of some shares in NEXT, a large

company, satisfies the "common ownership" prong of this analysis.  As indicated in the

agreement entered into between Thoele and NEXT, Thoele is an independent contractor

for NEXT.  (Brooks Aff. Ex. 1.)  With no other argument from Jackson, nor facts in the

record to suggest there is any significant common ownership between the companies, the

Court determines this factor clearly weighs against consolidating the companies in order

to meet Title VII's numerosity requirement.

### 5.      Conclusion

In analyzing the four <u>Baker</u> factors, the Court concludes that the resulting picture

does not permit MHFS and NEXT to be consolidated for purposes of Title VII.  The two

companies are not under common management, NEXT has no control over MHFS's labor

relations, and they are not commonly owned.  That the Court found some interrelation of

operations between the companies is not dispositive of its consideration of the other

Baker factors; even if the facts provide "some support for one of the consolidation

factors, all factors are to be considered, with no one factor controlling." Artis, 161 F.3d

at 1184.[9]  Accordingly, the Court determines that MHFS was Jackson's sole employer

and, as Jackson concedes that MHFS alone did not have the requisite fifteen employees

needed in order maintain a claim against it under Title VII, 42 U.S.C. § 2000e(b) (Mem.

in Opp'n at 14), her Title VII claims against MHFS and NEXT fail.

**B.    MHRA**

Jackson's state law claims under the MHRA are the only claims remaining before

the Court.  Because her Title VII claims will be dismissed, and thus the Court "has

dismissed all claims over which it has original jurisdiction," it may decline to continue to

exercise supplemental jurisdiction over the remaining state law claims.  28 U.S.C. §

1367(c)(3); see Ferris Baker Watts, Inc. v. Ernst & Young, LLP, 293 F. Supp. 2d 1003,

1008 (D. Minn. 2003).  Accordingly, the Court concludes that it will not continue to

exercise supplemental jurisdiction over Jackson's claims under the MHRA, and those

claims will be dismissed without prejudice.

**Conclusion**

Based on the foregoing, and all the files, records and proceedings herein **IT IS**

---

[9] See also Evans, 936 F.2d at 1090 ("Even were we to assume the existence of an interrelation of operations, given the common goals and interaction of McDonald's and its independent franchises, the record before us indicates no common management, no centralized control of labor relations, and no common ownership or financial control.").

**ORDERED** that Plaintiff Terri Jackson's Motion for Partial Summary Judgment (Doc. No. 42) is **DENIED** and Defendants' Motions for Summary Judgment (Doc. Nos. 15 and 31) are **GRANTED** as follows:

    I.    Jackson's Title VII claims against both defendants (Count I of the Complaint (Doc. No. 1)) are **DISMISSED WITH PREJUDICE**; and

    II.    Jackson's MHRA claims against both defendants (Count II of the Complaint) are **DISMISSED WITHOUT PREJUDICE**.[10]

    **LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: July 11 , 2005                s/Richard H. Kyle
                                    RICHARD H. KYLE
                                    United States District Judge

---

[10] See generally 28 U.S.C. § 1367(d).